JASON R. FLANDERS (SBN 238007)
Email: jrf@atalawgroup.com
J. THOMAS BRETT (SBN 315820)
Email: jtb@atalawgroup.com
AQUA TERRA AERIS (ATA) LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Telephone: (916) 202-3018

*Attorneys for Petitioners and Plaintiffs AquAlliance,
California Sportfishing Protection Alliance, and
California Water Impact Network*

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AQUALLIANCE; CALIFORNIA SPORTFISHING PROTECTION ALLIANCE; CALIFORNIA WATER IMPACT NETWORK, <br><br> Plaintiffs, <br><br> vs. <br><br> THE UNITED STATES BUREAU OF RECLAMATION; U.S. DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity; and DOES 1 – 100, <br><br> Defendants. | Case No.: <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF <br><br> (National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*) |

## I.  **INTRODUCTION**

1. This is a civil suit brought pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq.,

2. This action is brought by several California conservation organizations to challenge defendants' environmental review and approval of a 2021 groundwater pumping project covering a significant portion of the Sacramento River Valley, and imposing significant and irreversible threats to the people and sensitive species that rely on these water resources and associated aquatic and riparian habitats.

3. The Project would have detrimental effects on groundwater. These adverse groundwater effects will, in turn, adversely affect connected residential and agricultural wells, surface water, and habitats.

4. Rather than meaningfully evaluate the potentially significant and adverse impacts of the Project in a full Environmental Impact Statement, Defendant Bureau of Reclamation (hereafter "BOR" or "Reclamation") has completely abdicated its obligations under NEPA by preparing an Environmental Assessment replete with conclusory, incomplete, and faulty analysis.

5. Reclamation has failed to take a hard look at the impacts of the Project.

## II.  **JURISDICTION AND VENUE**

6. The Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a Defendant), and the APA. 11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because defendant USBR is located in Sacramento County, and a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred and will continue to occur in this judicial district. This complaint is timely filed within any and all applicable statutes of limitations.

## III. **INTRADISTRICT ASSIGNMENT**

7. Pursuant to Local Rule 120(d), intradistrict assignment of this matter to the Sacramento or Redding Divisions of the Court would be appropriate in that the events or omissions which give rise to Plaintiffs' claims occurred, are occurring, and/or will occur in Butte, Colusa, Glenn,

1 | Sacramento, Tehama, Yolo, and Yuba Counties.

2 | **IV. <u>PARTIES</u>**

3 |     8. Plaintiff AQUALLIANCE is a California Public Benefit Corporation organized to protect

4 | waters in the northern Sacramento River's watershed to sustain family farms, communities,

5 | creeks and rivers, native flora and fauna, vernal pools, and recreation. AquAlliance has

6 | approximately 637 members who rely on Sacramento Valley groundwater for their livelihoods

7 | and live, recreate and work in and around waters of the State of California, including the

8 | Sacramento River and its tributaries. AquAlliance's mission is to defend northern California

9 | waters and to challenge threats to the hydrologic health of the Sacramento River watershed.

10 | AquAlliance is especially focused on confronting the escalating threat to water resources and

11 | ecological habitats in Sacramento River hydrologic region resulting from water diversions to

12 | other parts of California and groundwater extraction in the area.

13 |     9. Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a

14 | non-profit public benefit corporation organized under the laws of the State of California with its

15 | main office in Stockton, California. CSPA has approximately 2,000 members who live, recreate

16 | and work in and around waters of the State of California, including the Sacramento River, San

17 | Joaquin River, the Delta, Suisun Bay and San Pablo Bay. CSPA is dedicated to the preservation,

18 | protection, and defense of the environment, the wildlife and the natural resources of all waters of

19 | California. To further these goals, CSPA actively seeks federal and state agency implementation

20 | of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf

21 | of itself and its members. CSPA has been actively engaged in proceedings relating to the

22 | environmental impact of the SWP as well as the federal Central Valley Project ("CVP").

23 |     10. Plaintiff CALIFORNIA WATER IMPACT NETWORK ("C-WIN") is a California non-

24 | profit public benefit organization with its principal place of business in Santa Barbara,

25 | California. C-WIN's organization purpose is the protection and restoration of fish and wildlife

26 | resources, scenery, water quality, recreational opportunities, agricultural uses, and other natural

27 | environmental resources and uses of the rivers and streams of California, including the

28 |

1    Sacramento River, its tributaries, and its underlying groundwater resources. C-WIN has members

2    who reside in, use, and enjoy the Sacramento River Valley and inhabit and use its watershed.

3    They use Sacramento River and its tributaries for nature study, recreation, and aesthetic

4    enjoyment.

5        11. Defendant UNITED STATES BUREAU OF RECLAMATION ("BOR" or

6    "Reclamation") is a subdivision of the Department of the Interior, an agency of the United States

7    of America, and is the Project's lead agency under the NEPA, 28 U.S.C. section 4321 et seq.

8        12. Defendant Deb Haaland is the Secretary of the United States Department of Interior.

9    Plaintiffs name Secretary Haaland in this action in her official capacity, for her actions or failures

10   to act in an official capacity, or under color of legal authority. Secretary Haaland is responsible

11   for ensuring that the Department of Interior's actions comply with its obligations and with the

12   APA.

13       13. Defendant UNITED STATES DEPARTMENT OF INTERIOR is responsible for the

14   administration and implementation of the federal reclamation laws, including the 1902

15   Reclamation Act, as amended, and others, and for projects operating under its authority.

16   **V.   LEGAL BACKGROUND**

17                      The National Environmental Policy Act ("NEPA")

18       14. Enacting NEPA, Congress recognized that "each person should enjoy a healthful

19   environment" and the statute therefore requires that the federal government use all practicable

20   means to "assure for all Americans safe, healthful, productive, and esthetically and culturally

21   pleasing surroundings," and to "attain the widest range of beneficial uses of the environment

22   without degradation, risk to health or safety, or other undesirable and unintended consequences."

23   Id. § 4331(b)–(c). It declares the federal government's responsibility to act "as [a] trustee of the

24   environment for succeeding generations" and to use "all practicable means" to "assure . . . safe,

25   healthful, productive, and esthetically and culturally pleasing surroundings," 42 U.S.C. § 4331.

26   Whether NEPA is implemented to meet those goals, or to defeat them, is the question at stake in

27

28

1    this litigation. And it is a question of critical importance to the health and well-being of

2    Plaintiffs' members and communities.

3       15. Ultimate responsibility for interpreting and enforcing NEPA falls to the federal courts.

4    *See*, *e.g.*, *Robertson*, 490 U.S. at 355-56; *NRDC v. Callaway*, 524 F.2d 79, 86 (2d Cir. 1975); *cf.*

5    *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981);

6    *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

7       16. The Council on Environmental Quality ("CEQ")—an agency within the Executive

8    Office of the President—has promulgated regulations implementing NEPA, see id. §§ 1500-

9    1508, which are binding on all federal agencies. Id. § 1500.3(a).

10      17. NEPA's goals are to (1) "prevent or eliminate damage to the environment and

11    biosphere," (2) "stimulate the health and welfare" of all people, and (3) "encourage productive

12    and enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321. To

13    fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental

14    impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching

15    its decision, will have available, and will carefully consider, detailed information concerning

16    significant environmental impacts," and (2) "the relevant information will be made available to

17    the larger audience that may also play a role in both the decision-making process and the

18    implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

19    349 (1989). "General statements about 'possible' effects and 'some risk' do not constitute a

20    'hard look' absent a justification regarding why more definitive information could not be

21    provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir.

22    1998). Similarly, "[c]onsideration of cumulative impacts requires some quantified or detailed

23    information" that results in a "useful analysis," even when the agency is preparing an EA and not

24    an EIS. *See Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002) (internal

25    quotation marks omitted). "[G]eneral statements about possible effects and some risk do not

26    constitute a hard look absent a justification regarding why more definitive information could not

27    be provided." *Id*. (internal quotation marks omitted).

28

18. NEPA requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement—the environmental impact statement (EIS)—must describe the environmental impacts of the proposed action. Id. § 4332(2)(C)(i), (ii). Through this mechanism, Congress intended NEPA to serve as "an environmental full disclosure law" that enables the public to "weigh a project's benefits against its environmental costs." *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1049 (2d Cir. 1985). Congress also intended NEPA environmental review to ensure "the integrity of the agency process," forcing agencies to "face" rather than "ignor[e]" "stubborn, difficult-to-answer objections." *Id.* "Simply by focusing the agency's attention on the environmental consequences of a proposed project"—by requiring preparation of a "detailed" environmental impact statement before projects that may have significant environmental impacts are approved—"NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 348-49; see 42 U.S.C. § 4332.4.

19. To determine whether a project would have significant effects to be reviewed in an EIS, NEPA allows agencies to first prepare an "Environmental Assessment" ("EA"), as provided, below. If the agency determines no EIS is required, it must support its conclusions in a Finding of No Significant Impact ("FONSI").

20.  40 C.F.R. § 1501.3 provides:

**Determine the appropriate level of NEPA review.**

(a) In assessing the appropriate level of NEPA review, Federal agencies should determine whether the proposed action:

⁋. . . ⁋

(2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§1501.5); or

(3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement . . .

(b) In considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment and degree of the effects of the action. Agencies should consider connected actions consistent with §1501.9(e)(1).

(1) In considering the potentially affected environment, agencies should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, such as listed species and designated critical habitat under the Endangered Species Act. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend only upon the effects in the local area.

(2) In considering the degree of the effects, agencies should consider the following, as appropriate to the specific action:

(i) Both short- and long-term effects.

(ii) Both beneficial and adverse effects.

(iii) Effects on public health and safety.

(iv) Effects that would violate Federal, State, Tribal, or local law protecting the environment.

21. 40 C.F.R. § 1501.5 provides:

ENVIRONMENTAL ASSESSMENTS.

⸮. . .⸮

(c) An environmental assessment shall:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; . . .

22. 40 C.F.R. § 1501.6 provides:

FINDINGS OF NO SIGNIFICANT IMPACT.

(a) (2) In the following circumstances, the agency shall make the finding of no significant impact available for public review for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin:

(i) The proposed action is or is closely similar to one that normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to §1507.3 of this chapter; or

(ii) The nature of the proposed action is one without precedent.

. . .

(c) The finding of no significant impact shall state the authority for any mitigation that the agency has adopted and any applicable monitoring or enforcement provisions. If the agency finds no significant impacts based on mitigation, the mitigated finding of no significant impact shall state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts.

23.  40 C.F.R. § 1506.1 provides:

LIMITATIONS ON ACTIONS DURING NEPA PROCESS

(a) Except as provided in paragraphs (b) and (c) of this section, until an agency issues a finding of no significant impact, as provided in §1501.6 of this chapter, or record of decision, as provided in §1505.2 of this chapter, no action concerning the proposal may be taken that would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

24.  40 C.F.R. § 1508.1 provides:

DEFINITIONS.

⟦. . .⟧

(g) *Effects* or *impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives.

(1) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

⟦. . .⟧

(s) *Mitigation* means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or

record of decision and that have a nexus to those effects. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation. Mitigation includes:

>     (1) Avoiding the impact altogether by not taking a certain action or parts of an action.

>     (2) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

>     (3) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

>     (4) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

>     (5) Compensating for the impact by replacing or providing substitute resources or environments.

25. To avoid *post hoc* agency rationalizations, "[p]roper timing is one of NEPA's central themes." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 718 (9th Cir. 1988). The agency must complete an EA before the "go-no go" stage of a project, *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (internal quotation marks omitted), which is to say before "making an irreversible and irretrievable commitment of resources," *id*. at 1143.

<u>The Administrative Procedure Act</u>

26. When an agency undertakes final agency action that fails to comply with NEPA, such action is unlawful and set must be aside under the APA. *See Cantrell v. City of Long Beach*, 241 F.3d 674, 679 n.2 (9th Cir. 2001) ("Although NEPA does not provide a private right of action for violations of its provisions, private parties may enforce the requirements of NEPA by bringing an action against the federal agency under § 10(a) of the Administrative Procedure Act."). The APA allows the reviewing court to set aside a final agency action only if it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law." 5 U.S.C. § 706(2)(A). "A decision is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)). An agency action is also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962)).

27. Under the arbitrary and capricious standard, and specifically when reviewing an agency decision to forego the preparation of an EIS, the Court must ensure that "the agency has taken a 'hard look' at the consequences of its actions, 'based [its decision] on a consideration of the relevant factors,' and provided a 'convincing statement of reasons to explain why a project's impacts are insignificant.'" *Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1008 (9th Cir. 2006) (quoting *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001)) (internal quotations and citations omitted).

## VI. <u>STANDING</u>

28. Members of AquAlliance, CSPA, and C-WIN reside in the Sacramento River Valley. AquAlliance's members rely on groundwater, rivers, and streams for their homes, recreation, to irrigate crops, and to participate in the economy of the region. AquAlliance's members play an active role in water education, planning, policy, and protection. CSPA and its members actively participate in water rights and water quality processes, engage in education and organization of the fishing community, conduct restoration efforts, and vigorously enforce environmental laws enacted to protect fisheries, wildlife, habitat and water quality. AquAlliance's, CSPA's, and C-WIN's members reside and own property throughout California as well as in those areas served by the Central Valley and State Water Projects, and the BOR. AquAlliance's, CSPA's, and C-WIN's member also reside in and around the Sacramento River valley, including within and in close proximity to the Action area, and use the waters, including groundwater, affected by the

Action for gardening, landscaping, and growing crops. As water contractors begin pumping additional groundwater pursuant to the Proposed Action, the project risks degrading or lowering the groundwater in areas where Plaintiffs' members operate wells or otherwise rely on groundwater to maintain their properties.

29. Members of AquAlliance, CSPA, and C-WIN use the Sacramento River and its tributaries to fish, sail, boat, kayak, swim, birdwatch, hike, view wildlife and engage in scientific study, including monitoring activities. Members of AquAlliance, CSPA, and C-WIN have enjoyed fishing for salmon and other fish in the Sacramento River watershed, whose numbers and vitality depend on an intact and healthy ecosystem in the Sacramento River watershed. Where elements of that ecosystem are reduced or eliminated, AquAlliance's , CSPA's, and C-WIN's members' recreational uses and aesthetic enjoyment of those areas are reduced by their awareness of the waterway and habitat degradation. As the degradation of the Sacramento River and its tributaries is further exacerbated, Plaintiffs' members' catch fewer fish, and observe fewer wildlife.

30. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Reclamation's failure to comply with NEPA and the likely dramatic impacts to groundwaters, surface waters, and associated species, ecosystems, and human uses. The relief sought herein will redress the harms to Plaintiffs and their members, landowners and water rights holders caused by Defendants' failure to comply with NEPA.

31. AquAlliance, CSPA, C-WIN, their members, officers, landowners and water rights holders are deeply concerned about the adverse consequences of Reclamation's Proposed Action to facilitate the additional pumping of up to 60,000 acre-feet of groundwater in the Sacramento River Valley, with inadequate environmental review of the adverse direct, indirect, and cumulative impacts of the pumping facilitated thereby. The Proposed Action will require the use of additional groundwater, increase depletion of Sacramento Valley groundwater basins and streams, residential and agricultural wells, and have potentially catastrophic impacts on the endangered species, including but not limited to the Western Yellow-billed Cuckoo and the

Valley Elderberry Longhorn Beetle. Plaintiffs' members will be injured by the additional water extracted from groundwater basins, as well as the resulting stream impacts without adequate environmental analysis.

32. Failure by Reclamation to ensure that the Proposed Action does not impact listed species and their habitats harms Plaintiffs' members' interests in the species. Unless the requested relief is granted, Plaintiffs' interests will continue to be injured. The injuries described above are actual, concrete injuries that will occur unless relief is granted by this Court. The relief sought herein, Reclamation's compliance with NEPA, would redress Plaintiffs' injuries. Plaintiffs have no other adequate remedy at law, and they bring this action on behalf of their adversely affected members.

## VII.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

33. Plaintiffs have performed all conditions precedent to this filing and participated in the administrative process.  Plaintiffs actively participated in the administrative process by submitting comments, along with other public agencies, organizations, and members of the public, outlining the claims contained herein.  As such, Plaintiffs have fully exhausted their administrative remedies, to the extent such remedies exist and to the extent that exhaustion of administrative remedies is legally necessary.

34. Plaintiffs possess no other remedy to challenge Defendants' abuses of discretion and failures to comply with applicable laws and regulations.

## VIII.   RECLAMATION'S APPROVAL OF THE ACTION

35. On July 7, 2021 Reclamation posted an Environmental Assessment evaluating the impacts of the Project. (hereafter the "Draft EA").

36. Reclamation provided the public with a week-long opportunity to comment on the Draft EA, received numerous comments letters, and issued a Final Environmental Assessment (hereafter the "EA").

37. On August 4, 2021, and based on the analysis contained in the EA, Reclamation issued a Finding of No Significant Impact (FONSI-21-06-BDO) (hereafter the "FONSI").

38. The FONSI concluded that the Proposed Action in the EA would have no significant impact on the human environment.

The Proposed Action

39. The stated purpose of the Proposed Action is to "offset surface water diversions from the Sacramento River…[and] incentivize further reductions above current commitments in order to make additional surface water supply available in the Sacramento River." EA at 1. Reclamation purports to achieve this goal by funding additional pumping of groundwater by "entities in the pilot project who operate existing groundwater wells…." Finding of No Significant Impact, FONSI-21-06-BDO at 1.

40. The EA, however, is severely misleading and fails to provide evidentiary support for its assertion that groundwater extracted by the Action will result in up to 60,000 acre feet of surface water to remain in stream, untouched. The EA also fails to take a hard look at the adverse environmental effects resulting from the increased groundwater extraction facilitated by the Proposed Action.

41. As the EA notes, California is facing water supply shortages due to over-appropriation, and ongoing worsening climate effects. As such, reduced water usage by the SRSC and others is legally and physically required. These are not voluntary actions by the participants. The FONSI more clearly explains this, in contradiction to the false promises of the EA: "The Proposed Action will have temporary beneficial effects to agricultural lands from increased reliability of water supplies in 2021. The Proposed Action does not take land out of production and allows some land to remain in production." FONSI at 6. Hence, surface water supplies are, to use the FONSI's term, *unreliable*, because they are very likely *unavailable*. Thus, as the FONSI notes, additional groundwater may allow some lands to remain in production; implying that without this groundwater, an equal amount of surface water would not be available to support production. The stated purpose of the Action is thus misleading, inaccurate, and unsupported by law or fact.

42. The true purpose of the Action is for the Bureau to provide funding appeasement to the SRSC to avoid suit from the SRSC related to the Bureau's reduced deliveries for other legal and physical reasons.

43. The EA states that, "[u]nder the Proposed Action, Reclamation will provide funding for the use of existing groundwater wells to further offset surface water diversions from the Sacramento River, which is estimated to result in a reduction of up to approximately 60,000 AF in surface water diversions by SRSCs from the Sacramento River. The quantity of water represents an approximate maximum; the actual total could be less." EA at 5. Literally read, the only quantity provided in this passage is an estimated reduction in surface water demands. In turn, the EA asserts that the actual total could be less, which "actual total" refers to the only quantity provided—for potential surface water savings—meaning the actual surface water conservation could be less than the EA estimates.

44. Somewhat shockingly, the EA repeatedly asserts a goal of maximum groundwater pumping, even encouraging well owners to establishing new historic low groundwater levels through this Action. For example, the EA states that "the groundwater level data collected during this drier year with the proposed voluntary approach provides an opportunity to gather additional groundwater level." EA at 6. Similarly, the Bureau has instructed water users that "non-Transfer Program Settlement Contractors may wish to *establish historic lows* on their wells and use this opportunity to establish baseline conditions of their wells for use in future transfers." EA Appendix B at 2 (emphasis added).

45. The EA states that "[f]unding provided by Reclamation would be subject to an agreement outlining the terms required by Reclamation. Participants will be required to comply with the terms of the Proposed Action, or they will not receive funding. Furthermore, non-compliant participants would be required to pay appropriate fees to reschedule water, which act as a deterrent." Appendix A p. 5, 13. If the referenced agreement is Appendix B to the EA, which is entirely unclear, those terms provide no mitigation or environmental commitments to avoid significant effects, nor any analysis thereof, and in fact clearly show that the Action

groundwater will not offset an equal (if any) surface water diversions. As discussed, below, the additional pumping will most likely drain connected surface waters, which the EA fails to meaningfully analyze.

46. Federal regulations would allow BOR to tier and incorporate by reference from prior environmental review documents. See 43 C.F.R. §46.135 ("(b) Citations of specific information or analysis from other source documents should include the pertinent page numbers or other relevant identifying information.") With a small few exceptions, the EA violates this requirement, and instead generally references prior environmental documents consisting of thousands of pages, without pinpoint page references to the incorporated materials. Moreover, most all pinpoint cites provided generally describe the affected environment, but are dated and so only provide general descriptions, not actual existing conditions during this drought; nor does the incorporated material provide environmental analysis of the proposed Action. The EA clarifies, furthermore, that the "Proposed Action is not tiered from previous projects." EA at 3. In sum, therefore, the EA's reference to past related environmental documents serves only to load the record with irrelevant and unincorporated materials.

<u>Groundwater Impact Analysis</u>

47. The EA fails to take the requisite "hard look" at effects to groundwater.

48. The EA fails to provide any meaningful description of the existing environmental conditions that will be affected by the Action. Existing groundwater levels, for example, during this time of drought, are not provided. The final revised EA, for the first time, includes a regional map identifying 160 small green dots as potential Action well locations, with no further information about participating wells or groundwater conditions in the areas surrounding the participating wells. EA at 4, 6.

49. Worse, the letter agreement between the Bureau and SRSC expressly excludes prior groundwater pumping this year by the SRSCs from the environmental baseline against which the Action is evaluated, with no legal justification, and no explanation in the EA of how this significant omission clearly renders the groundwater impacts of the project worse than the EA

1   actually discloses. EA Appx. B at 2. The prior groundwater pumping is not part of typical SRSC

2   operations. The EA is unclear whether any groundwater pumping having already occurred this

3   summer is or is not included as part of this Action.

4       50. One commentor noted that "With respect to groundwater, current standing water

5   levels have dropped below 2014-2015 historic lows. A significant number of domestic wells

6   have lost water with more added to the list daily. Across the west side of Colusa County and

7   extending down into Yolo County Agricultural wells are experiencing record declines

8   necessitating lowering of pumps and in some cases loss of the well." EA Appx. A at 1. Thus, the

9   Action could easily result in private or public groundwater wells running dry, giving rise to

10  potentially significant health and safety concerns necessitating an EIS. See, 40 C.F.R. §

11  1501.3(b)(2)(iii)).

12      51. Another commenter stressed that groundwater withdrawals from deeper aquifers

13  often have adverse impacts on groundwater availability in shallower aquifers located closer to

14  the surface: "The hydraulic head in the A (and B Level) provides critical support to the overlying

15  C and D (350' and ±100') aquifer levels. When water is pumped from the deep levels, this

16  reduction in head slowly telegraphs upward, and lower the C and D levels. Over the 2011 to

17  2015 pumping period, the C and D levels both dropped 8 feet. There is not supposed to be any

18  influence on the B, C or D levels due to this deep pumping. Yet it looks like there are." EA

19  Appx. A at 3. The EA, however, wholly ignores these concerns and fails to analyze potential

20  impacts to shallow groundwater aquifers as a result of pumping facilitated by the Proposed

21  Action.

22      52. The EA only provides that "Regional groundwater levels under the Proposed Action

23  would be, at a minimum, monitored monthly (or weekly as feasible) prior to, during, and

24  following voluntary groundwater pumping. The monitoring would occur at wells monitored by

25  the DWR and participating SRSCs." EA at 6. The EA fails to provide any information

26  supporting a standard of monthly monitoring sufficient to avoid significant effects; indeed such

27

28

1  monitoring could and likely may occur only after all groundwater pumping is concluded, thereby

2  providing no opportunity or means to mitigate or avoid any affects at all.

3      53. What's more, the EA fails to account for the time needed to transmit, process, and

4  analyze any monitoring data. This further risks that GDEs in the project area may be irreparably

5  harmed before BOR has been able to evaluate the full effects of groundwater extraction.

6      54. "In the case that groundwater level declines are detected during the period of

7  groundwater pumping for the voluntary program, Reclamation will evaluate the affected area to

8  assess which groundwater wells may need to reduce or cease pumping until groundwater levels

9  recover to restart pumping." EA 6. This statement fails to provide any standard by which BOR

10  will determine whether or why any well would need to reduce or cease pumping, providing no

11  real description of actual environmental effects. Moreover, any area that "recovers" after

12  pumping is reduced would be recovery water from surface waters, or other groundwater

13  migration or mobilization, since no precipitation will occur over this time, which begs the

14  question of what effects will occur, and recur, after supporting "recovery" around a participating

15  well. This falls far short of the requisite hard look.

16      55. The EA also fails to explain how region wide abstractions would provide information

17  on likely localized effects. EA at 6 ("The wells would be distributed throughout the areas where

18  voluntary groundwater pumping occurs in order to provide a representative depiction of basin-

19  wide groundwater levels.")

20      56. One commenter, for example, stresses that Glenn-Colusa Irrigation District ("GCID")

21  "production wells affect other private pumpers up to a four mile radius. "The graphic I produced

22  is more generous and shows what a three mile radius encompasses: 48,900 acres less a little

23  GCID land." EA Appx. A at 3. In response, BOR compares the approximately 60,000 acre-feet

24  of resulting from the Proposed Action, to the 2.25 million acre-feet of groundwater pumping

25  occurring throughout *the entire Sacramento River Valley* stating that "the use of 60,000 AF

26  under this voluntary program is well within the range of historic groundwater use for the region."

27  EA at 20; and EA Appx. A at 3. BOR's analysis comparing total pumping over the entire

28

Sacramento River Valley, however, does not address the localized impacts (e.g. within three to four miles) to private wells resulting from the increased pumping authorized by the Proposed Action. That an additional 60,000 acre-feet may seem minimal in relation to the total volume of water pumped from the Sacramento River Valley annually, says nothing about the *localized* impacts of those withdrawals to private users.

57. At the individual level, the EA shockingly relies solely "on 3rd party complaints of individual performance." EA at 15. In other words, the EA does nothing to anticipate or avoid effects to third party wells, instead simply waiting for injury to occur, then providing a vague assurance that the Bureau will address it. This assessment is woefully inadequate.

58. The EA repeatedly asserts, with no supporting analysis whatsoever, that "Participants under the Proposed Action will comply with all applicable state and Federal laws. Participants will acquire all required and applicable permits or licenses from the appropriate Federal, State, or local authorities necessary for the delivery of water." EA at 7. This dictate fails to provide any meaningful information about the project.

59. Two commenters noted that the groundwater users covered by the Action likely do not possess legal rights to extract the subject groundwater. Specifically, the commenters expressed concerns that beneficiaries of the Proposed Action, including the Glenn-Colusa Irrigation District, lack the requisite groundwater appropriative water rights to conduct the additional extraction facilitated by the Proposed Action. In response to these concerns, the Bureau simply repeated its refrain that all participants would comply with all relevant laws, without taking any look whatsoever as to whether the Action is subsidizing illegal groundwater extraction. EA Appx. A at 2 and 11. Thus, the EA and FONSI fail to rely on any evidence to reach the conclusion that the Action would comply with all relevant law, and an EIS should have been prepared. See, 40 C.F.R. § 1501.3(b)(2)(iv).

60. The EA states that "This real-time groundwater management program would allow the maximum use of groundwater, while minimizing effects," but fails to provide any actual groundwater impact analysis to support this conclusion. EA at 6.

61. The "Environmental Commitment" for the project reaches the exact same result, relying on nothing more than regional monitoring, largely after the fact, and with no discernible explanation of what, where, when, why, or how any adverse environmental effects would be reduced or avoided. EA at 7. The monitoring would not monitor subsidence, nor effects to groundwater dependent ecosystems, nor surface waters, nor effects to third parties; and monitoring results likely would be available only after effects occur.

Greenhouse Gas Emissions

62. The EA fails to quantify or assess the Proposed Action's effects of increasing greenhouse gas emissions by subsidizing groundwater pumping. Indeed, the EA completely fails to even explain what level of GHG emissions would be significant. The EA notes that "CARB uses a threshold of 25,000 metric tons CO2 per year as a threshold for including facilities in its cap-and-trade regulation. (17 CCR 95800-96023.)" EA at 10. The EA fails to disclose whether or why this would constitute any meaningful standard for consideration of the effects of this project, or whether the project would exceed that threshold. Similarly, the EA explains that "All diesel-fueled engines are subject to CARB's Airborne Toxic Control Measure (ATCM) for Stationary Ignition Engines (17 California Code of Regulations [CCR] 93115)" (EA at 11), but that regulation provides no regulation of GHG at all. Thus, when the EA repeats its unsupported assertion that "All pumps proposed to be used by the water agencies would operate in compliance with all rules and regulations at the federal, state, and local levels, including the ATCM," the EA again fails to provide any meaningful description of the environmental effects of the project, falling far short of the requisite hard look; and the proposed "Environmental Commitment" is essentially none. EA at 10-11.

Groundwater Dependent Ecosystems

63. The EA acknowledges that this groundwater pumping will likely affect groundwater dependent ecosystems, including riparian habitats of affected surface waters, but the EA and FONSI fail to take hard look at these serious effects, and fail to rely on evidence, or a clear analytical route to their conclusions that effects would not be significant.

64.  CDWA noted in its July 14, 2021 comment letter, "The production wells proposed for use in groundwater pumping are in areas that likely contain GDEs, which may be impacted by the project…GDEs in the vicinity of production wells are primarily along the Sacramento River and its tributaries."

65. The EA states that "[t]his additional use of groundwater will reduce stream flows during and after pumping as the groundwater aquifer refills. Increased subsurface drawdown will potentially affect fish habitats, such as riverine, riparian, seasonal wetland, and managed wetland habitats, which are reliant on groundwater for all or part of their water supply. Decreased amounts of surface water in these habitats could affect fish species of management concern. The Proposed Action will increase groundwater pumping compared to the No Action Alternative, which will result in reduction of groundwater levels in the vicinity of pumps. Subsurface draw down has the potential to affect riverine, riparian, seasonal wetland, and managed wetland habitats." EA at 13-14.

66. The EA then provides no evidence or project components to support its bald assertion that "Commitments associated with the Proposed Action, such as implementing a regional monitoring network, will avoid adverse impacts to vegetation relative to the proposed groundwater pumping." EA at 14. The EA fails entirely to further analyze such effects, and completely ignores these effects when concluding the opposite, that "groundwater pumping for the Proposed Action does not impact shallow groundwater conditions." *Id*. The EA does note that several special status species rely on riparian and aquatic habitats, but provides no discussion of effects to special status species living in riparian habitat affected by groundwater drawdown.

67. EA admits that the Groundwater Sustainability Plan ("GSP") for the project area is not complete. Instead, it uses as a proxy the Yuba County GSP for its analysis of adverse impacts to GDEs. Specifically, BOR concludes that pumping facilitated by the Proposed Action will not substantially affect shallow groundwater conditions because the Yuba GSP finds that shallow groundwater conditions are affected by changes to water in irrigated lands, fields, canals, or

drains, rather than due to groundwater withdrawals such as those resulting from the Proposed Action. EA at 14. The EA assumes here, without any actual analysis, that the same conditions persist throughout the project area as in the Yuba County GSP project area. The Yuba GSP deals with a far smaller area that is separate from the EA project area. The analysis in the Yuba County GSP is inapposite. It does not shed light on existing conditions GDE conditions in the project area, or evaluate the impacts to GDEs located therein. This is a failure to take a hard look at potential impacts to GDE. EA at 14.

68. The Yuba GSP actually analyzed and detailed where GDEs are located within the project area, and utilized monitoring well data to support its conclusions regarding the impact of GW depletions on GDEs. The EA simply assumes, without any analysis, that a similar study for the EA project area (which is much larger, and is separate from the GSP area) would have the same results. This is not a hard look at whether the project would have significant impacts on GDEs.

69. This also renders the EA's baseline inadequate. The EA assumes the baseline in the Project Area is the same as the Yuba GSP even though the documents deal with completely different geographical areas of analysis, both in terms of location and size. EA at 14. The EA covers actions from Shasta County to Sacramento County, close to 150 miles.

70. One commenter notes that Valley Oaks, a common GDE species in the pumping area, are reliant on groundwater located up to 80 feet below the surface. EA Appx. A at 6. The commenter further notes that the EA fails to identify or evaluate GDE impacts to these species that draw on deeper groundwater. *Id.* Indeed, there is no discussion of impacts to the Valley Oak or other deep rooted GDEs in the EA, nor is there any analysis in the EA of GDE rooting depths, or any specific species of plant communities that may be impacted by withdrawals facilitated by the Proposed Action.

71. The EA makes several references to groundwater impact assessments in the 2019 LWT EIS/EIR, but fails to cite any specific pages of the thousands of pages included in the 2019 LWT EIS/EIR record. EA at 14.

72. The EA's Environmental Commitment to monitor regional well monitoring networks for comparisons to low groundwater levels reached in 2014 and 2015 provides no information at all about the effects that may occur, and no avoidance measures or environmental commitments. No information is provided regarding what effects occurred in 2014 and 2015. No information is provided describing present and expected groundwater levels compared to 2014 and 2015. No evaluation of environmental effects during pumping activities is provided, especially where monitoring only occurs at a regional level.

73. The failure of the EA to evaluate the impacts of groundwater withdrawals from deep aquifers on shallow groundwater resources, discussed in paragraph 49 above, is equally relevant in the context of GDEs. The EA contains no analysis of the potential impact to GDEs reliant on relatively shallow groundwater supplies resulting from deeper extractions potentially facilitated by the Proposed Action.

74. The EA also provides no information or evidence to support its false promise that "The Proposed Action allows for increased availability of water to remain in the Sacramento River or stored in Shasta Reservoir by reducing reliance on surface water diversions. The Proposed Action will also provide water for beneficial uses." EA at 14. As discussed, above, nothing in the Action requires surface waters to be untouched in an equal amount to the Action groundwater pumping, nor is there a commitment to a specific beneficial use in a specific timeframe, which defies common sense under the circumstances.

<u>Hydrology and Surface Waters</u>

75. The EA again asserts, with no supporting evidence and defying common sense, that "By reducing reliance on surface water diversions in this very dry year, Reclamation and the SRSCs intend to increase availability of water for beneficial purposes in the Sacramento Valley, including listed aquatic species, fish, birds, farms and cities." EA at 22. During a time of scarcity, the SRSCs are obviously looking to obtain all water supplies available. The letter agreement between the Bureau and SRSCs makes this perfectly clear, and directly contradicts the Bureau's falsehood that groundwater in this Action will fully offset and reduce surface water

1  diversions. EA Appx. B at 1-2. Elsewhere the EA admits that groundwater pumping will

2  decrease surface water supplies, but the EA takes no look at these physical effects whatsoever.

3  Because the significant effects are not addressed, an EIS is required.

4  <u>Listed Species</u>

5      76. The EA fails to take the requisite "hard look" at adverse effects to the Valley

6  Elderberry Longhorn Beetle ("VELB" or the "beetle") and the Western Yellow-billed Cuckoo,

7  two species listed under the Endangered Species Act at 16 U.S.C. § 1531 et seq.

8      77. BOR states that any effects to the beetle are less than significant because,

9  "groundwater pumping for the Proposed Action does not impact shallow groundwater

10  conditions, as those are driven by contributions from the Sacramento River and from nearby

11  irrigated agriculture. There are no changes…to irrigated lands, or water levels in fields, canals, or

12  drains, as a result of the Proposed Action. Further, Reclamation maintains flows in the

13  Sacramento River…." EA at 15.

14      78. BOR appears to adopt the same analysis here as it does in its discussion of impacts to

15  GDEs generally. Namely, that the GDEs providing habitat for the VELB rely on shallow

16  groundwater that is not affected by the withdrawal resulting from the Proposed Action. For the

17  reasons discussed above in paragraphs 62-73, BOR's analysis is flawed. Similarly, and also for

18  the same reasons as discussed in paragraphs 50-51, 59, and 71, the regional monitoring network

19  proposed by the EA is not sufficient to mitigate significant impacts to the beetle.

20      79. Finally, the EA lacks and meaningful analysis or discussion on potential adverse

21  impacts to the listed Western Yellow-billed Cuckoo. The EA first states that critical habitat for

22  the Cuckoo extends from Red Bluff to Colusa, California along the Sacramento River. EA at 13.

23  As the Central Delta Water Agency stated in its July 14, 2021 comment letter, the critical habitat

24  within the "Action Area overlaps directly, and is adjacent to, four of the participants, with a fifth

25  participant just downstream of the habitat."

26      80. The EA's cursory analysis of potential impacts to the Western Yellow-billed Cuckoo

27  states in full: "[m]anaged wetlands and flooded agriculture in the Sacramento Valley provide

28

1   critical nesting and wintering habitat for millions of migratory birds. There are no changes

2   proposed by the participants relative to irrigated lands, or water levels in fields, canals, or drains,

3   as a result of the Proposed Action. There are no changes to critical habitat for the Western

4   Yellow-billed Cuckoo in the Proposed Action area." EA at 15. The EA fails to discuss habitats

5   other than managed wetlands or flooded agriculture that provide habitat for migratory birds,

6   including the Western Yellow-billed Cuckoo, to what extent those habitats are present in the

7   Project Area, and whether those habitats will be adversely affected by the Proposed Action.

8   Instead, the EA states in conclusory terms that there will be no changes to critical habitat for the

9   species in the Proposed Action area. *Id.* This minimal and conclusory analysis is wholly

10   inadequate, fails to provide an adequate baseline description of Western Yellow-billed Cuckoo

11   habitat, and does not constitute the hard look at the impacts of the Proposed Action on the

12   species required by the APA.

13                                   Cumulative Effects

14          81. As several commenters note, the EA's conclusory cumulative impacts analysis

15   section is flawed. EA Appx. A at 5, 12. The EA essentially admits to potentially significant

16   cumulative effects, without actually disclosing or describing them, noting that "[w]hile a

17   groundwater well may continue to be operated, it would not be in connection with the voluntary

18   groundwater pumping approach funded by Reclamation." EA at 6, 20. In other words, after the

19   Action groundwater pumping causes significant effects, the Bureau will have no authority to stop

20   further pumping and additional significant effects.  There is also no documentation of 2021 well

21   use before the project commenced.

22          82. The EA generally acknowledges that several cumulative effects to groundwater

23   resources could occur. "Additional groundwater pumping occurs at other wells across the

24   Sacramento Valley in 2021 to meet water needs. This increased pumping is especially prominent

25   among non-SRSC water users throughout the Sacramento Valley who experience even greater

26   reductions in water supply due to current drought conditions." EA at 22. "The proposed

27   groundwater pumping would be in addition to groundwater pumping at a well that would occur

28

1   in absence of the voluntary approach (i.e., in addition to groundwater pumping due to limited

2   surface water supplies or in addition to participation in a groundwater substitution water

3   transfer). Under the No Action Alternative or under the Proposed Action, SRSCs and landowners

4   could operate additional pumps for groundwater wells outside the discretion of Reclamation, not

5   in connection with a voluntary groundwater pumping approach funded by Reclamation." EA at

6   23. The cumulative effects discussion vaguely alludes to "separate environmental documents"

7   that analyzed some other projects that would cause cumulative effects, but the EA fails to

8   identify which documents it refers to, fails to provide any page citations to such documents, and,

9   of course, cannot claim that these other project documents assessed the new impacts of this

10  Action, or the cumulative effects of those actions with the Proposed Action.

11        83. One commenter highlights the failure of BOR to evaluate the potentially significant

12  cumulative effects the Central Valley Project ("CVP") and State Water Project ("SWP")

13  operations when combined with the Proposed Action. EA Appx. A at 8. In response, BOR states

14  simply that, "Cumulative effects are disclosed in the Cumulative Effects section of the EA. Text

15  has been added to clarify this section." *Id.* at 8. Yet, the EA plainly contains no analysis of the

16  cumulative effects of the Proposed Action combined with groundwater extractions associated

17  with any other state, federal, or private activities, including the CVP and SWP. EA at 22.

18        84. The EA repeatedly refers to the Action as a "pilot" or "demonstration" project, which

19  can only be read to mean that a repeat of the Action in future years is contemplated or even

20  desired. Yet, the EA fails entirely to discuss this multi-year dimension, and fails to consider the

21  Action in this cumulative context.

22        85. One commenter asked whether several groundwater pumping projects from

23  participating entities had been considered in the cumulative effect assessment, which the Bureau

24  failed to answer. EA Appx. A at 10.

25        86. The EA fails entirely to assess the resulting cumulative effects to other groundwater

26  users, groundwater dependent ecosystems, surface waters, greenhouse gas emissions, or any and

27

28

all other affected resources, for that matter. The EA therefore fails to take a hard look at the question. The FONSI is not supported by fact or reason.

## IX.  <u>INJUNCTIVE AND DECLARATORY RELIEF</u>

87. Injunctive relief is necessary to prevent Defendants from continuing to engage in the unlawful practices alleged herein.  Defendants and persons acting in concert therewith have done, are now doing, and will continue to do or cause to be done, the above-described illegal acts unless restrained or enjoined by this Court.  Plaintiffs have no plain, speedy, or adequate remedy at law, in that pecuniary compensation alone would not afford adequate and complete relief.  Unless Defendants are restrained from committing further illegal acts, their above-described acts will cause great and irreparable damage to Plaintiffs.

88. An actual controversy now exists between Plaintiffs and Defendants concerning their rights, privileges, and obligations in that Plaintiffs contend that Defendants' above-mentioned actions have violated and will continue to violate their rights under federal law and Defendants contend in all respects to the contrary.

## IX.  <u>CLAIM FOR RELIEF</u>

**The Bureau violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.**

89. The Bureau's approval of the Action was a major federal action that requires compliance with NEPA. See 42 U.S.C. § 4332(2)(C).

90. The Bureau's EA violated NEPA by failing to take the requisite hard look at the significant environmental effects of the Action. See, e.g., 40 C.F.R. §§ 1502.1, 1502.16(a), (b), 1501.9(e). Among other things, the EA failed to adequately analyze:

- the project purpose and need;
- baseline environmental conditions;
- significant effects to groundwater, including subsidence, third party users, surface waters, and groundwater dependent ecosystems;
- aquatic and terrestrial species;

- species listed pursuant to the Endangered Species Act;
- public health and safety;
- compliance with applicable federal, state, and local law;
- significant cumulative effects; and,
- greenhouse gas emissions.

91. Furthermore, the Bureau's FONSI was arbitrary and capricious, since the agency failed to make a convincing case that the impacts of the Action are not significant.

92. The environmental impacts associated with the Action are "significant," 40 C.F.R. § 1501.3(b), and thus by preparing an EA/FONSI rather than an EIS, the Bureau violated NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations.

93. For each of these reasons, the Bureau's approval of the EA, FONSI, and the Action, were "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law." *See* 5 U.S.C. § 706(2)(A).

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a) Declare that Reclamation violated the National Environmental Policy Act and its implementing regulations and the Administrative Procedure Act by failing to adequately evaluate the effects of the Action, failing to provide a rational basis or support for its Finding of No Significant Impact, and failing to prepare an environmental impact statement;

b) Remand the Finding of No Significant Impact and Environmental Assessment for compliance with the National Environmental Policy Act and the Administrative Procedure Act;

c) Vacate the Finding of No Significant Impact and Environmental Assessment;

d) Enjoin Reclamation from proceeding with the Action unless and until Reclamation prepares an environmental impact statement evaluating the impacts of the Proposed Action;

e)   Issue such temporary restraining order(s), preliminary injunction(s) and/or permanent injunctive relief as may be requested hereafter by Plaintiffs;

f)   Award Plaintiffs costs of litigation, including reasonable attorneys' fees; and

g)   Grant Plaintiffs such other relief as the Court deems just and proper.

DATE: <u>August 26, 2021</u>                           AQUA TERRA AERIS LAW GROUP

Jason R. Flanders
J. Thomas Brett
Counsel for Plaintiffs AquAlliance, CSPA, and C-WIN