UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| AQUALLIANCE; CALIFORNIA SPORTFISHING PROTECTION ALLIANCE; and CALIFORNIA WATER IMPACT NETWORK,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>THE UNITED STATES BUREAU OF RECLAIMATION; U.S. DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity; and DOES 1 - 100,<br><br>　　　　Defendants. | No. 2:21-cv-01533 WBS DMC<br><br><u>ORDER RE: REQUEST FOR</u><br><u>PRELIMINARY INJUNCTION</u> |

----oo0oo----

Before the court is plaintiffs' motion for a preliminary injunction barring defendants from continuing with a groundwater extraction project in the Sacramento River Valley.  (See Pls.' Mot. for TRO and/or Preliminary Injunction ("Mot.") (Docket No. 6).)  The court held a hearing on the on

1

September 9, 2021.

I.     Factual and Procedural History

This case concerns a Voluntary Groundwater Pumping Program ("program") approved by the United States Bureau of Reclamation ("Reclamation") seeking to incentivize groundwater pumping in lieu of obtaining water from the Sacramento River. Under the program, Reclamation will provide funding to offset costs to those who obtain water by groundwater pumping rather than by drawing from surface water.

On July 7, 2021 Reclamation issued a draft Environmental Assessment, evaluating the impacts of the project, for public comment. After the comment period, Reclamation issued a final Environmental Assessment ("EA"). (See Decl. of James Thomas Brett, Ex. A, Environmental Assessment (Docket No. 9-2).) On August 4, 2021, Reclamation issued a Finding of No Significant Impact ("FONSI"), (see Decl. of Brett, Ex. D, Finding of No Significant Impact (Docket No. 9-5)), determining that no Environmental Impact Statement ("EIS") was required.

Plaintiffs filed their complaint on August 26, 2021, and a Motion for Temporary Restraining Order and/or Preliminary Injunction on September 1, 2021. The motion for temporary restraining order was heard on September 7, 2021 and denied on September 8, 2021. A hearing on the request for a preliminary injunction was held before the undersigned on September 9, 2021. It is anticipated that the case will be finally submitted to the court for decision on the merits, either by cross-motions for summary judgment or after trial on the administrative record, sometime before the December holidays.

## II. Discussion

Injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam). In order to obtain a preliminary injunction, the moving party must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); Cal. Trucking Ass'n v. Bonta, 996 F.3d 644, 652 (9th Cir. 2021). "A plaintiff must make a showing on all four prongs to obtain a preliminary injunction." A Woman's Friend Pregnancy Res. Clinic v. Becerra, 901 F.3d 1166, 1167 (9th Cir. 2018) (internal quotation marks and citations omitted).

### A. Likelihood of Irreparable Harm

"Under Winter, plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011). The irreparable harm alleged here is that approving and contracting for additional groundwater extractions will result in, among other things, damage to private and public property via land subsidence and aquifer depletion, and harm to habitats of endangered species. (Mot. at 21-22 (Docket No. 6-1).) In order to be entitled to a preliminary injunction, it is not enough that plaintiffs merely allege irreparable harm -- plaintiffs "must

1  demonstrate immediate threatened injury." <u>Caribbean Marine</u>
2  <u>Servs. Co. v. Baldridge</u>, 844 F. 2d 668, 674 (9th Cir. 1998).  For
3  the following reasons, the court concludes that plaintiffs have
4  failed to meet this burden.
5        The court does not expect plaintiffs to be able to
6  predict with scientific exactitude the harm which will result if
7  defendants are not enjoined.  But the court does expect more than
8  the kind of vague generalizations and unquantified conclusions
9  presented here.  For example, plaintiffs rely on the declarations
10 of Michael Billiou and Kit Custis to support their claim that
11 groundwater pumping will damage property "due to ongoing and
12 worsening land subsidence, and aquifer depletion."  (Mot. at 21-
13 22 (Docket No. 6-1).)  However, the best that Billiou has to
14 offer is that he "believes" prior data shows declines in ground
15 surface elevation due to pumping that began in 2010, which is the
16 underlying cause of damage to irrigation infrastructure on his
17 ranch.  Yet he provides no specific evidence of a causal link
18 between the pumping and damage, or of the similarity of the past
19 pumping to the current program.  (<u>See</u> Decl. of Michael Billiou at
20 2 (Docket No. 6-2).)
21       Further, Billiou expresses concern that prior pumping
22 led to subsidence and the need for a replacement well on his
23 property, but he provides no evidence of how Reclamation's short-
24 term project would lead to similar problems.  (<u>See</u> <u>id.</u> at 3.)
25 Similarly, Custis discusses in detail the effects of prior
26 pumping, but does not even attempt to quantify the predicted
27 effect of the current program.  (<u>See</u> Decl. of Kit Custis at 4-7
28 (Docket No. 6-3).)  Such generalizations are not enough to

4

demonstrate immediate irreparable harm.

Plaintiffs further allege in conclusory terms that groundwater-dependent ecosystems and endangered species are "likely to be harmed" (Mot. at 22 (Docket No. 6-1) (emphasis added)), and Custis expresses concern regarding the adequacy of the monitoring program for groundwater-dependent ecosystems but provides no basis to anticipate any specific harm that may occur to these ecosystems. (See Decl. of Kit Custis at 4-11 (Docket No. 6-3).) Plaintiffs appear to rely on the declaration of Barbara Vlamis to establish irreparable harm to endangered species, but Vlamis simply expresses "grave[ ] concern" about the impact of endangered species without elaborating upon any specific and immediate consequences. (See Decl. of Barbara Vlamis at 3 (Docket No. 6-5).) Again, plaintiffs' conclusory statements are not sufficient to demonstrate the imminence of the harm to groundwater-dependent ecosystems and endangered species.

Plaintiffs claim the project incentivizes groundwater pumping via contracts that will lead to "new historic groundwater lows." (Mot. at 22 (Docket No. 6-1).) However, plaintiffs do not provide information on the baseline of the groundwater pumping currently occurring, nor do they provide any information on the increase that will result from the program, if any.[1] Defendants represented during oral argument that the funding will be provided to partially offset the cost of groundwater pumping

---

[1] The court is cognizant of plaintiffs' claim that Reclamation itself does not provide a current baseline, but nonetheless it remains the plaintiffs' burden to demonstrate irreparable harm.

5

to program participants.  However, because the funding will not cover the entirety of the cost groundwater users will incur, it is unclear to what extent Reclamation's incentivization efforts will be successful, making the program's impact speculative at this stage.

Finally, plaintiffs are complaining of a harm that is already occurring in the program's absence.  The purpose of a preliminary injunction is to stop or prevent harm that will occur in the absence of preliminary relief between the time of the request and the resolution of the case.  The groundwater extraction project does not allow groundwater pumping for the first time; rather, it merely funds an activity that is already occurring.  Further, plaintiffs admit that the problem of land subsidence and aquifer depletion is "ongoing," so there is no showing of any new immediate harm that would occur if an injunction is not granted.  (Mot. at 21 (Docket No. 6-1).)

Moreover, Reclamation is not committing the alleged harm -- third parties are currently pumping groundwater and will continue do so regardless of the outcome of this program. Indeed, plaintiffs concede that Reclamation has no power to stop landowners from pumping.  It is unclear at this stage what effect, if any, Reclamation's program will have on the amount of groundwater to be pumped.  Since the payments to the users of groundwater will not even cover the full additional costs they will incur for pumping groundwater instead of using surface water, it is not even clear that the program will result in any additional pumping of groundwater.  That is entirely speculative at this stage.

6

1 For all of the foregoing reasons, plaintiffs have failed to demonstrate the likelihood of irreparable harm, and for that reason alone the court would be required to deny their request for a preliminary injunction.

B.  <u>Likelihood of Success on the Merits</u>

Even assuming plaintiffs were able to show a likelihood of irreparable harm, they nonetheless fail to show a likelihood of success on the merits.

The court reviews plaintiffs' National Environmental Policy Act ("NEPA") claims challenging Reclamation's decision under the Administrative Procedure Act ("APA"). <u>Lands Council v. Powell</u>, 395 F.3d 1019, 1026 (9th Cir. 2005) (reviewing NEPA claims under APA); <u>Ocean Advocs. v. U.S. Army Corps of Eng'rs</u>, 402 F.3d 846, 858 (9th Cir. 2005) (same). Under the APA, 5 U.S.C. § 706(2)(A), the reviewing court must set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." <u>See</u> <u>Marsh v. Or. Nat. Res. Council</u>, 490 U.S. 360, 376-77 (1989).

An agency action may be deemed arbitrary or capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.</u>, 265 F.3d 1028, 1034 (9th Cir. 2001) (quoting <u>Motor Vehicle Mfrs.</u>

7

Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

The court must ask "whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made." Nat. Res. Def. Council v. U.S. Dep't of the Interior, 113 F.3d 1121, 1124 (9th Cir. 1997) (internal quotation marks omitted). The court should conduct this review based on the administrative record presented by the agency. See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 450 F.3d 930, 943 (9th Cir. 2006) ("When reviewing an agency decision, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.") (internal quotations and citations omitted).

NEPA, which "exists to ensure a process, not particular substantive results," Hells Canyon Alliance v. U.S. Forest Service, 227 F.3d 1170, 1177 (9th Cir. 2000), imposes additional requirements. Specifically, where a federal agency recommends or reports on "proposals for legislation and other major Federal actions significantly affecting the quality of the human environment," the agency must include "a detailed statement . . . on (i) the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C).

"Where an EIS is not categorically required, the agency must prepare an Environmental Assessment to determine whether the environmental impact is significant enough to warrant an EIS." Ocean Advocs., 402 F.3d at 864. If, after preparation of the EA, the agency determines that it is not, the agency must put

1 forth a "convincing statement of reasons [in the form of a FONSI]
2 that explain why the project will impact the environment no more
3 than insignificantly." Id. (citation omitted); see also 40
4 C.F.R. § 1508.13 (listing requirements for a FONSI). For an
5 agency's decision to satisfy NEPA, the record must show that the
6 agency took a "hard look" at the project's potential impact.
7 Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350
8 (1989).
9       In their motion for a preliminary injunction,
10 Plaintiffs raise six ways in which they contend the EA and FONSI
11 are deficient and therefore inadequate under NEPA. The court
12 addresses each of these in turn.
13       1.   Failure to Describe Existing Conditions
14       Plaintiffs first contend that the EA fails to describe
15 current environmental conditions, thereby providing an inadequate
16 baseline against which to measure potential harms attributable to
17 the program. (Mot. at 6-7 (Docket. No. 6-1).) This claim is
18 without merit.
19       The EA includes a proposal to use water years 2014 and
20 2015 as a baseline against which to measure the project's effects
21 on groundwater levels. (EA at 15-16, 20-21.) Public comments
22 submitted in response to a draft version of the EA do not contest
23 the adequacy of the use of this proposed baseline. (See Decl. of
24 Brett, Ex. B, Comments and Reponses (Docket No. 9-3) ("Comments
25 and Responses"); Decl. Brett, Ex. E Comment Letters (Docket No.
26 9-6).) The EA justifies the use of the 2014 and 2015 years by
27 noting that these water years were "critical drought years" that
28 represented "historic lows." (EA at 15, 16.) Reclamation

contends that the failure to object to this approach results in the waiver of plaintiffs' ability to raise the argument in this litigation. (Opp. to Pls.' Motion for TRO at 10-11 (Docket. No. 14).)

Even assuming that formal waiver does not apply, the EA and FONSI's omission of a more current baseline may be fairly attributed to Reclamation's rational opinion that data representing recent historic lows would be adequate for the purposes of this limited project.[2] Accordingly, plaintiffs' challenge to the EA on the basis that it lacks a description of existing groundwater levels does not demonstrate that Reclamation failed to take the requisite hard look at the project's potential impacts.

This conclusion receives additional support from the fact that the project provides incentives for the pumping of 60,000 additional acre feet ("AF") of water, which the EA and FONSI emphasize is a low amount compared with average annual groundwater use (2.25 million AF) and groundwater pumped during dry years (4.5 million AF). (EA at 20; FONSI at 6; see also Comments and Responses at 3 (raising this point in response to public comment).) The FONSI further notes that adverse effects are likely to be brief due to the action's short term, which runs

---

[2] One public comment includes a passing reference to current water levels being "below 2014-2015 historic lows." Comments and Reponses at 1. It is unclear, however, and public comments do not address, whether this differential renders the 2014 and 2015 data inadequate for use in this project.

10

from August to October 2021.[3]  (FONSI at 6.)  Under these circumstances, Reclamation's determination that a current and exact baseline was not required to adequately mitigate harm appears reasonable.

### 2. Effects to Third-Party Groundwater Users

Plaintiffs next claim that the EA inadequately evaluated the possibility of adverse effects on third-party groundwater users, thereby creating the possibility of "significant adverse effects to third party property."  (Mot. at 8 (Docket. No. 6-1).)  Specifically, plaintiffs contend that "land subsidence[ ] and impacts to groundwater wells[ ] might occur" as a result of the increased groundwater pumping the program seeks to incentivize.  (Id.)  This claim also lacks merit.

Here, the EA acknowledges these possible impacts to ground wells and possible subsidence, noting rates of subsidence measured in recent decades and expressly attributing this to "groundwater pumping and subsequent consolidation of loose aquifer sediments."  (EA at 19.)  The EA further acknowledges that "[e]xtraction of groundwater used in lieu of diverting surface water to make surface water available could decrease groundwater levels, increasing the potential for subsidence."  (Id. at 20.)  Nevertheless, the EA also explains that Reclamation will continuously monitor pumping at participating wells to evaluate the impact of additional

---

[3] A portion of this period has already elapsed, meaning the true project period would be shorter.

production through a hybrid approach, tracking groundwater levels regionally and at individual wells. (Id.) The EA goes on to explain how, pursuant to the program, Reclamation will suspend individual wells' participation in the program, and suspend incentive payments accordingly, if local groundwater levels drop below acceptable levels. (Id.)

This monitoring plan reflects a considered response on Reclamation's part to the acknowledged risks posed by additional groundwater pumping, offering "sufficient detail to ensure that environmental consequences have been fairly evaluated," see S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior, 588 F.3d 718, 727 (9th Cir. 2009) (citation omitted), and thus withstands "hard look" review as to third-party effects. In seeking to use mitigation measures to soften a proposed action's impact, "agenc[ies] must provide an assessment of whether the proposed mitigation measures can be effective and whether anticipated environmental impacts can be avoided." Protect Our Cmtys. Found. v. Jewell, 825 F.3d 571, 582 (9th Cir. 2016) (internal quotation and alteration marks omitted). Reclamation has specifically done so here. (See EA at 20 (stating that if problems arise due to pumping promoted by the action, "large portions of the production well network will be shut down and not allowed to participate in the voluntary program until the monitoring network recovers"); FONSI at 7 (same).)

The EA also notes that this monitoring will occur "prior to, during, and following" pumping. (EA at 6.) That this monitoring will, in part, occur "prior to" participants' additional groundwater pumping contradicts plaintiffs' claim that

12

1  "Reclamation will only consider effects to third parties <u>after</u>
2  <u>they occur</u>."  (Mot. at 9 (Docket. No. 6-1) (emphasis in
3  original).)  Given that no contracts have yet been entered into
4  for additional pumping under the program, Reclamation retains the
5  opportunity to follow through on this commitment prior to the
6  commencement of additional pumping -- a commitment it reaffirmed
7  at oral argument -- and as a steward of critical public resources
8  this court expects that it will do so.

         3.    <u>Impacts to Groundwater-Dependent Ecosystems,
Hydrology, and Threatened Species</u>

11  Plaintiffs next complain that Reclamation used data
12  from the Yuba County Groundwater Sustainability Plan ("Yuba
13  Sustainability Plan") in determining that the project was
14  unlikely to significantly impact shallow groundwater in the
15  Sacramento River Valley, arguing that the two areas are
16  different.  (Mot. at 11 (Docket. No. 6-1).)  The EA explains,
17  however, that because a Groundwater Sustainability Plan for the
18  project area has not yet been completed, the Yuba Sustainability
19  Plan provides the most comparable analysis available in light of
20  the two areas' similarities.  (EA at 14.)  Under the
21  circumstances, Reclamation's comparison suffices to constitute a
22  hard look on this point.
23  Plaintiffs also contend that Reclamation failed to take
24  a hard look at whether the program would succeed in its goal of
25  increasing surface water availability by incentivizing the use of
26  additional groundwater in lieu of surface water, or at whether
27  additional groundwater use would result in a temporary decrease
28

13

to surface water flows.  At oral argument, however, Reclamation clarified that program contracts would obligate participants to forgo using an amount of surface water equal to the amount of additional groundwater they pump as a condition of receiving incentive payments.  Even without such a guarantee, Reclamation could reasonably conclude that additional groundwater pumped due to program incentives would likely achieve this result.  (See id. at 5-6; FONSI at 6.)

Next, Plaintiffs contend that Reclamation failed to take a hard look at the project's impact on two species listed as threatened, the Western Yellow-Billed Cuckoo and the Valley Elderberry Longhorn Beetle.  (Mot. at 13 (Docket. No. 6-1).)  However, the EA addresses both, noting that in both cases agricultural lands on which these species rely will not be impacted by the program, based on Reclamation's estimation that pumping does not significantly impact shallow groundwater levels in these areas.  (EA at 15.)  Reclamation's treatment of these concerns survives "hard look" review.

### 4. Mitigations Measures

In its EA, Reclamation includes groundwater monitoring as a mitigation measure to evaluate performance.  (See id. at 20.)  Reclamation is not required to include a completely developed mitigation plan as part of its program.  See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 352-53 (1989).  Rather, a "reasonably thorough discussion of mitigation measures" is enough to satisfy the "hard look" standard.  See City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1154 (9th Cir. 1997) ("Mitigation must be discussed in sufficient

detail to ensure that environmental consequences have been fairly evaluated.").

Plaintiffs claim the mitigation measure lacks data demonstrating that it will be effective in avoiding potentially adverse impacts. (See Mot. at 16 (Docket No. 6-1).) Reclamation does plan to consider analytical data provided by a regional groundwater monitoring network to evaluate performance in comparison to the baseline data from 2014 and 2015. (See EA at 6, 20-21.) Based on this data, if groundwater drops below expected levels, Reclamation will shut down portions of the production well network until the network performs consistently with expectations. (See id. at 6, 20.) Reclamation's use of data provided by the regional networks demonstrates the informed nature of Reclamation's program.

Plaintiffs next claim Reclamation omits consideration of long-term damage. (Mot. at 16 (Docket No. 6-1).) However, Reclamation's mitigation plan accounts for the need to stop any potential long-term damage by shutting down portions of the production well network that are not meeting expectations or impacting third-party wells. (See EA at 20-21.) Further, the monitoring will concur "prior to, during, and following" the pumping. (See id. at 6.) Reclamation's plan for monitoring demonstrates that it considered the long-term effects of the program.

Plaintiffs also contend that Reclamation impermissibly fails to prescribe monitoring of third-party wells, groundwater-dependent ecosystems, surface waters, or threatened species. However, the EA states Reclamation will receive and consider

complaints regarding third-party impacts. (See id. at 21.) Plaintiffs' contention, if correct, would require Reclamation to examine the program's impact on an extensive list of things that may be impacted, but this would be unfeasible, especially for a short-term project. An indirect change to the environment is not enough to require a "hard look" at every aspect. See Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1053 (9th Cir. 2012) (quoting Tri-Valley CAREs v. U.S. Dep't of Energy, 671 F.3d 1113, 1129 (9th Cir. 2012)) ("We do not require the agency 'to compile an exhaustive examination of each and every tangential event that could impact the local environment.'"). Here, Reclamation appropriately considered a mitigation plan to overcome effects of the program.

### 5. Greenhouse Gas Emissions

Plaintiffs also claim Reclamation failed to take a hard look at effects of greenhouse gas emissions resulting from the program. However, Reclamation's EA explicitly lists the pollutants that are emitted by groundwater pumping. (See EA at 9-10.) Further, Reclamation relies on data regarding the greenhouse gas emissions to determine the environmental impact and concludes that emissions would not be significant. (See id. at 10-11.) Reclamation also ensures the program's compliance with local rules and regulations concerning air quality and greenhouse gas emissions. (See id.) Reclamation's inclusion of these items demonstrates that it took a hard look at greenhouse gas emissions.

### 6. Cumulative Effects

Lastly, plaintiffs argue that Reclamation fails to

16

consider any cumulative effects the program may have.  Yet, Reclamation examined the groundwater pumping already occurring in the region to determine cumulative effects.  The proposed pumping was found to be insignificant relative to the total groundwater pumping in the area, leading to no significant cumulative effect.  (See id. at 20, 22-23.)  Under these circumstances, Reclamation adequately considered the cumulative effect of the program.

For the foregoing reasons, plaintiffs have not met their burden of showing a likelihood of success on the merits, and for that additional reason their request for preliminary injunctive relief must be denied.

C.   Balance of Equities and Public Interest

When the government is a party, the balance of equities and public interest factors merge. Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).  To determine the balance of equities, the court must "balance the interests of all parties and weigh the damage to each." Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138 (9th Cir. 2009) (citation omitted).  Here, both sides seek to preserve important environmental resources, demonstrating a strong public interest, but propose different means of achieving those interests.

As discussed above, the harm that plaintiffs allege will occur to property, groundwater-dependent ecosystems, threatened species, and the water supply, absent injunctive relief, is largely speculative.  On the other side, Reclamation is attempting to deal as best it can with the critical problem of too little water to meet the essential needs of all of the users

in the Sacramento River Valley.  In addressing that problem, Reclamation seeks to achieve a more balanced use of surface and groundwater.  As Reclamation explained in the EA, the FONSI, and at oral argument, the benefits of preserving available surface water are many and include ensuring availability of drinking water for the public, water for migratory birds, fresh water to repel saltwater intrusions into the Sacramento River Delta, and cold water to aid the survival of salmon during upcoming seasonal runs.[4]  (See EA at 2; FONSI at 1; Opp. at 2 (Docket No. 14).)  Reclamation's proposal appears to be in the public interest.

It also appears to be in the best interest of the public to implement the program as soon as possible in order to reduce the amount of surface water being used during a period of serious drought.  Because Reclamation's program is only in effect from August to October, 2021 -- a portion of which has already elapsed, with no implementation thus far -- further delay risks entirely precluding the project's implementation, and therefore its expected beneficial impact.  On balance, given the project's short time frame -- now effectively from September to October -- and the need for increased surface water availability, the balance of equities and public interest appear to weigh against the issuance of an injunction.

---

[4]  As noted above, project contracts will obligate participants to forgo use of surface waters in an amount equal to the additional groundwater they pump, ensuring that additional pumping done under the project will result in reduced surface water use.  In other words, to the extent that participants pump additional ground water pursuant to the project, Reclamation will achieve its stated goal of increasing surface water availability.

Because plaintiffs have not met their burden on any of the <u>Winter</u> injunctive relief factors, IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (Docket No. 6) be, and the same hereby is, DENIED.

Dated: September 14, 2021

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE